## JAMES P. MARSH CORPORATION v. UNITED STATES GAUGE CO.
### No. 7787.

Circuit Court of Appeals, Seventh Circuit.
June 11, 1942.

Rehearing Denied July 14, 1942.

162

James A. Hoffman and Strauch & Hoffman, all of Washington, D. C., and Lester B. Mann and Mann, Brown & Cox, all of Chicago, Ill., for appellant.

Geo. W. Hansen and M. Hudson Rathburn, both of Chicago, Ill. (Thiess, Olson & Mecklenburger, of Chicago, Ill., of counsel), for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

This appeal is from a decree which enjoined the defendant from infringing patent No. 2,170,561, covering a "Combined Bourdon Tube and Trap," which is a mechanism for operating the indicator of a steam pressure gauge. Defendant denies infringement. It also assails the validity of the patent, because of (a) an estoppel arising out of the Patent Office action and plaintiff's acquiescence therein and defendant's reliance on plaintiff's acquiescence; (b) action of the Patent Office wherein plaintiff's claim covering a structure like defendant's was denied allowance; and (c) the novelty of plaintiff's patented combination did not rise to patentable invention unless restricted closely to the particular structure shown in the drawings and specifications. If construed so as to cover defendant's product, it could not withstand the withering attack of the old art batteries.

Defendant also asserts a lack of jurisdiction of the District Court, which urge is based upon the charge that defendant, though licensed to do business in Illinois and having an office in Chicago where the business of soliciting orders was transacted, was not doing business as required by the statute. It asserts its place of business was not a "regular and established place of business" as defined by Sec. 48 of the Judicial Code, 28 U.S.C.A. § 109. Nor was there a sale by it in Chicago, of the alleged infringing gauge. The only transaction in Chicago was a forwarding of orders for gauges, the acceptance by defendant in New York being necessary to the completion of the sale. Hence, there was no invasion of the plaintiff's patent which could be vindicated in the U. S. District Court for the Northern District of Illinois.

Under the facts as found by the court, there can be no question but that the learned District Judge properly denied the motion to dismiss this suit for want of jurisdiction. The court found that there was a sale by defendant in Chicago; that the defendant was licensed to do business in Illinois; and it maintained a "regular and established place of business" in Chicago.

Moreover, under the rule of General Electric Co. v. Marvel Rare Metals Co., 287 U.S. 430, 53 S.Ct. 202, 77 L. Ed. 408 (see also Neirbo Co. v. Bethlehem Shipbuilding Corporation, 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167, 128 A.L.R. 1437), the defendant may waive venue. What constitutes a valid service upon an authorized representative of a foreign corporation must depend upon the facts showing the agency and his authority. "Doing business" and "regular and established place of business" are terms which have vexed and perplexed courts on many occasions. Remington Rand Business Service v. Acme Card System Co., 4 Cir., 71 F.2d 628; Scott & Williams, Inc. v. Hemphill Co., D.C., 14 F.Supp. 621, are two illustrations. The views which they voice we accept.

Here, however, all doubt is removed, provided the findings of fact are accepted. We do accept them because they are not only supported by the evidence, but clearly established by the proof.

Of the various defenses interposed, we deem it necessary to consider only that of non-infringement. The serious questions arising out of Patent Office rulings and their alleged res judicata effect, and the action of the plaintiff, which defendant

asserts now should estop it from its present assertion of validity of the claims in issue, will be considered by us only in so far as they affect the construction of said claims,—particularly their breadth.

Counsel for both sides have favored us with helpful briefs on this issue of non-infringement, the determination of which involves both factual and legal questions. The factual questions are more difficult because they involve mechanical engineering problems which are explained in the language and terms of the mechanical engineer. The patent deals with the somewhat enigmatic subject of a "Combined Bourdon Tube and Trap," which, however, is more awesome and forbidding in terms than in reality.[1]

We adopt the following statement from the plaintiff's brief. Plaintiff's patent was made on application of Harold L. Joyce, May 13, 1932. It was issued some seven years later, on August 22, 1939. It covered an invention which had received extensive commercial recognition, both by plaintiff and defendant, continuously since 1932.

Prior to that time, commercial pressure gauges utilized a Bourdon tube as the pressure responsive element for actuating the needle or pointer or indicator of the gauge, through a train of connection and gearings which were well known and in wide commercial use.

Boiler codes adopted by the American Society of Mechanical Engineers prescribed how gauges should be constructed. One, at least, had provided that the Bourdon tube element of steam gauges when used for measuring steam pressure must be protected from direct contact with the hot steam. Subjecting the Bourdon tube directly to live or hot steam causes it to become annealed, and consequently its resiliency is impaired, which in turn destroys the accuracy of the response of the indicator needle.

Bourdon steam pressure gauges prior to Joyce's invention were commonly provided with so-called siphon or traps located externally of the gauge housing and between the boiler and the gauge, the obvious purpose of such siphons or traps being to prevent live steam from entering the Bourdon tube, while permitting the steam pressure to act through a body of liquid confined in the trap thereby actuating the Bourdon tube.

The external siphons were costly and unsightly and the Joyce invention overcame this difficulty (although it was not the first to do so) by providing the pressure gauge structure which incorporated the siphon or trap within the gauge housing and thus eliminated the external ball or pig tail siphon, yet without complicating the construction of the gauge *per se* and without resort to expensive casting or machine operation.

We are not holding that simplicity, economy of space or cost, attractiveness of appearance, are not collectively, or singly, utilitarian in character, or the legitimate goal or result of a patentable invention. They are not only worthy of patent grants, but often constitute the single step which, when supplemented by other simple advances, made by others, completely revolutionizes industries.

It is not within the special wisdom of courts to very accurately appraise inventions, or the advances which they mark. Presumptuous indeed are the judicial pronouncements which are written in overconfident condemnation of seemingly simple, novel combinations. Frequently are mechanical problems deemed simple when appraised from a view point of an after-the-solution seat in the reviewing stand. These pronouncements too often demon-

---

[1] We take the following from the court's findings:

"A Bourdon tube is a well known pressure-responsive device comprising a hollow tubular member which is longitudinally curved and closed at one end. When the tubular member is rigidly fixed at a point remote from the closed end and the interior of the tubular member subjected to either pressure or vacuum, the free end thereof is caused to move due to changes in the curvature of the portion of the tubular member between the fixed point and the closed end. The fixed point is the 'end' of the Bourdon tube regardless of whether the tubular member from which the Bourdon tube is formed terminates at that point or extends beyond that point.

"Bourdon tubes are generally formed of materials which will anneal and cause the Bourdon tubes to lose their accuracy if subjected to high temperatures over a * * * period of time. In steam pressure gauges the Bourdon tube must be protected by a siphon or trap from direct contact with live * * * steam."

164

strate rather conclusively that "the power of prophecy dwells no more with man"—especially with judges passing judgment on the potentiality of new, patented articles. The experiences of industry, the acceptance by the public, afford the best, the only true answer to the claims of the opposing parties and of the prophets.

We therefore accept the contention of plaintiff—not seriously disputed by defendant—that there was patentable novelty in Joyce's combination and utilitarian virtue in the result accomplished by it.

This concession being made, we must likewise express the view that the novelty which is here asserted as the basis of patentable invention is not outstanding, nor are the claims entitled to a construction which would give them a broad range of equivalents. The invention clearly falls under the well-known and widely-inclusive group known as improvement patents. Such group is chiefly composed of product patents.

This does not detract from their commercial value nor does it lessen the right of the inventor. Yet it is of vital importance to a competitor surveying the field which is open to him and concentrating on the boundaries of the field exclusively occupied by the patentee who warns him to keep off the enclosed premises almost before the inventor's boundary stakes are located.

The patent system encourages invention, not only in that it rewards the inventor with a patent, but it spurs the competitors to put forth their best effort to produce a product as good, yet different from the patentee's.

Thus, defendant may have quickly realized that Joyce had brought forth something which would dominate the trade unless met by an equally satisfactory gauge. The new article, however, could not be produced by defendant unless it was essentially different from patentee's gauge. Defendant asserts it did exactly this. Plaintiff denies it. Plaintiff argues that defendant in producing its new (and admittedly somewhat different) gauge, crossed and necessarily invaded its exclusively owned and controlled domain of steam gauge construction wherein the Bourdon tube and the trap were enclosed in a housing and the avoidance of steam heat contacting the Bourdon tube was practically provided for in an apparatus which was cheaper, better, and more attractive than was found in the art up to 1932.

Determination of infringement turns upon the construction which should be given the claims after reading them and the specifications in the reflected light of the prior art. Below are set forth three claims, Claims 4, 6, and 11,[2] which, we think, are typical of the five claims in issue. Each claim is divided, as we think it must be, in-

2 Claim 4.

"A pressure gauge comprising

(a) a post having a bore formed therein and a *passage extending therethrough*,

(b) a Bourdon tube having *one of its ends positioned in said passage*, the opposite end being movable in response to pressure therein,

(c) *a tubular element having its opposite ends positioned in said bore and passage, respectively*, a portion of said tubular member being disposed in spaced relation with respect to said passage to provide a trap for confining liquid between the movable end of said Bourdon tube and *the end of said tubular member positioned in said bore*."

Claim 6.

"A pressure responsive instrument comprising

(a) a post formed with a longitudinally extending bore for a portion of its length and with a *transverse passage therethrough* beyond the longitudinal bore,

(b) a Bourdon tube having *one end connected to one end of the transverse*

passage, the free end of the tube being movable in response to pressure therein,

(c) and a pressure-transmitting tubular *device* connected between the longitudinal bore and the *other end of the transverse passage* and having a loop portion forming with the Bourdon tube a trap for confining a body of liquid, the said body of liquid preventing the fluid entering the longitudinal bore from gaining access to the Bourdon tube."

Claim 11.

"A pressure responsive device comprising

(a) a post formed with a longitudinal passage and a *transverse passage* in non-intercepting relation thereto,

(b) a Bourdon *tubular element* having *one end portion anchored to said post within one end of said transverse passageway*, the free end portion of the Bourdon element being movable in response to pressure therein, and

(c) a curved *tubular element having one end anchored on said post in communication with said longitudinal passage and its other end anchored with-*

to the three elements which constitute what patent lawyers call "the combination."

The patent concept, the arguments in the Patent Office, the rulings of the Patent Office Examiner, and the language of the claims disallowed,—all lead to one conclusion, i. e., plaintiff obtained a patent on a particular structure consisting of three elements, to-wit, a Bourdon tube, a trap, and a post, all advantageously located so that economy and simplicity of structure were attained.

In accomplishing this end, plaintiff used three elements, each of which is described with particularity. This was the structure which the defendant had to meet in the trade and also to avoid in a patent infringement suit. Defendant sought to accomplish those two results (avoidance of infringement and successful competition in the market) by (a) making its apparatus with only two elements and (b) avoiding the structural requirements of each element of plaintiff's claims as set forth in said claims and which are italicized in our quotation of characteristic claims.

It must be admitted that in an effort to avoid infringement of a patent, as much skill is often displayed as is shown in the conception or development of invention itself. There is, however, nothing objectionable in this. In fact, it is thus that the patent system is working at its best. For it is then that we have competition between a holder of a legal monopoly and his competitors. It illustrates how the legal monopoly evidenced by a patent excites the competitors to their best to meet or excel the product covered by the existing patent. Competition among industrial rivals and inventors is thus incited.

Plaintiff contends that infringement is not avoided by providing a single element which fully meets and responds to the plurality of elements in a patented combination. In support thereof it cites several cases from this court: Sears Roebuck & Co. v. Delta Mfg. Co., 7 Cir., 78 F.2d 745; Simplex Appliance Co. v. Star Can Opener Co., 7 Cir., 37 F.2d 491; United States O. Co. v. U. S. O. Co., 7 Cir., 62 F.2d 881; Hutchins Car Roofing Co. v. Standard Ry. Co., 7 Cir., 259 F.

226; Sutherland Paper Co. v. Auburn Carton Corp., 7 Cir., 118 F.2d 862, 864.

Also cited is the Supreme Court case of Temco Electric Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298.

Defendant contends that unless "every element, material or part mentioned in the claim, or its equivalent, is used, and unless all of the elements or their equivalents are combined in the same or substantially the same way and coact or cooperate in substantially the same way to produce a result of substantially the same nature," infringement is not shown. Its reliance is upon Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959; 48 Corpus Juris 299, 314, 317.

■■ We are convinced that infringement is rarely determined by decisions in other patent suits, but rather by the facts in each individual case. The cases which have been cited above are reconcilable. They all harmonize. Each requires the courts to first appraise the invention and then ascertain whether the patent grants were more or less than that which was discovered or disclosed. Reconciliation of the cited decisions is possible only if we give weight and effect to the phrase—mechanical equivalents. If necessary to fully protect the patent and the discovery disclosed therein, we will apply the mechanical equivalents doctrine to catch an infringer. We will not invoke the doctrine if the inventor seeks to stretch his discovery so as to include a product legitimately distinguishable from the concept of the invention.

So construing the decisions and applying them to this case, we conclude that it would be an undue enlargement of the monopoly to include a product with one of the three vital elements omitted. It would unjustifiably extend the doctrine of equivalents to a patent in which the specific structure of the product was the heart of the invention. The express language of the claims forbids it. The specifications stress the specific structure. The action of the Patent Office and the position of

*in the other end of said transverse passage for establishing communication between said longitudinal passage and the said fixed end portion of the Bourdon element, said curved tubular element constituting a loop to form with* said Bourdon element a trap for confining a body of heat insulating substance that prevents the fluid that enters said longitudinal passage from gaining access to said Bourdon element."

166

the patentee when broader claims were refused, forbid the construction for which the plaintiff now contends.

Defendant's structure avoids the language of the claims in the respect indicated by the italicized words. We will not allow it to escape infringement by resorting to the adoption of any mechanical equivalent of any one of the elements of the patent. But mechanical equivalents is a relative term. It is elastic enough to catch the evil practitioner who copies the thought and omits only the unimportant and unessential features. It will not be stretched so as to extend the concept to include a product essentially different, conceived by another who did not follow the teaching or use the concept of the inventor, as disclosed in the patent.

It is hardly necessary to elaborate upon the differences in the two products. Suffice it is to say, we must exercise our judgment on whether we have a case for the application of the doctrine of mechanical equivalents. Concluding that we have not, the issue of infringement is determined and adversely to the plaintiff.

The decree is reversed, with directions to dismiss the complaint.