**PARMELEE PHARMACEUTICAL COMPANY, and William V. Consolazio,** Appellants,

v.

**Lawrence C. ZINK, d/b/a Zink Safety Equipment Company,** Appellee.

No. 16493.

United States Court of Appeals
Eighth Circuit.

Jan. 25, 1961.

Edward A. Haight, Chicago, Ill., Donald E. Johnson, Hovey, Schmidt, Johnson & Hovey, Kansas City, Mo., on the brief, for appellant.

James C. Wood, Chicago, Ill., Lloyd W. Mason, Hofgren, Brady, Wegner, Allen & Stellman, Chicago, Ill., on the brief, for appellee.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and REGISTER, District Judge.

BLACKMUN, Circuit Judge.

This patent infringement action is one instituted by William V. Consolazio, patentee and owner, and Parmelee Pharmaceutical Company, exclusive licensee, against Lawrence C. Zink, d/b/a Zink Safety Equipment Company, seller of the accused product. Injunctive relief and damages are sought. The action is defended by Zink's manufacturer, Standard Safety Equipment Company; the defenses alleged are non-infringement, invalidity, and file wrapper estoppel. The District Court held that the patent was not infringed by the accused product and dismissed the complaint.

United States Letters Patent No. 2,478,182, issued to Consolazio August 9, 1949, is involved. It bears the title "Sodium Chloride Tablet". It matured from an application filed by Consolazio on January 16, 1945, and prosecuted by the Department of the Navy,[1] and it emerged from the Patent Office in the form of a single allowed claim reading as follows:

> "An internally reinforced sodium chloride tablet comprising compressed granules of sodium chloride; and an internally disposed cellular stroma of a thin, permeable, dialyzing film of a material selected from the group consisting of cellulose acetate and cellulose nitrate, the cells of said stroma containing said granules of sodium chloride, whereby the sodium chloride is rendered slowly available when the tablet reaches the gastro-intestinal tract, the solution time of the sodium chloride in said tablet in the gastro-intestinal fluids being from 60 to 80 minutes for a ten grain tablet."

The accompanying specifications refer to the use of salt tablets to combat the ill

1. Consolazio evidently developed his claimed invention while he was an officer in the United States Naval Reserve on active duty. In accord with the provisions of 35 U.S.C.A. § 266 the Government is given a royalty-free license by a recital in the patent itself.

effects of heat and excessive sweating; the known incidence of epigastric discomfort, nausea and vomiting following their ingestion; the resort, as a consequence, by some steel mills to the alternative use of salted drinking water; the objections thereto; an earlier theory that the adverse symptoms were due to irritation of the gastric mucosa by prolonged contact with salt; consequent attempts to develop a tablet which would disrupt and go into solution almost immediately and thus avoid prolonged contact; the lack of success of tablets of that kind; and the patentee's contrary concept of *retarding* the rate of absorption of salt with resulting elimination of discomfort. They also contain the usual general statement as to the invention.[2]

The patentee's tablet was commercially successful. The accused tablet, which appeared later and after advice of counsel that it did not infringe, conforms in general construction to the patentee's tablet and accomplishes the same result. The film employed in the defendant's tablet, however, is *not* of "the group consisting of cellulose acetate and cellulose nitrate". It is, instead, "shellac".[3]

In its opinion, 188 F.Supp. 821, supporting its dismissal of the complaint the District Court noted the application's long tenure (over 4 years) in the Patent Office, its original title "Tablets and Methods of Preparing Same", and the file wrapper history with its successive rejection of claims; characterized the art as crowded; and concluded that the patent was awarded only after the one claim had been limited to "a material selected from the group consisting of cellulose acetate and cellulose nitrate" and that, this being the case, the patent has no range of equivalents. The court thus entered its judgment of non-infringement without reaching and deciding what it called "the interesting issue of patentability of the plaintiffs' instant patent claim".

█ We are aware that the Supreme Court has said that "of the two questions (validity and infringement), validity has the greater public importance" and that full inquiry into the question of validity "will usually be the better practice". Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644. While we recognize the reason for this, viz., "that invalid claims shall not remain in terrorem of the art", Royal Typewriter Co. v. Remington Rand, 2 Cir., 168 F.2d 691, certiorari denied 335 U.S. 825, 69 S.Ct. 50, 93 L.Ed. 379, and while we could entertain some doubt as to the validity of this patent, we would encounter difficulty, as

---

2. "According to my invention, the time of solution of tablets is prolonged by impregnating the tablets or coating the active ingredient thereof with water-insoluble, non-toxic, permeable, membranous films which are readily elminated from the system by excretion in the feces. * * *

"The impregnating or coating agents which have been found to be most effective are cellulose derivatives, and, in particular, cellulose acetate and cellulose nitrate. * * *

"The cellulose acetate or nitrate penetrates the tablet forming a honey-comb structure around the salt granules. The granules are contained in small cellular compartments so that, in dissolution, fluid dialyzes into the cellular compartments, and salt or other enclosed material dialyzes out into the surrounding fluid, resulting in slow availability of the substance desired.

"Also, when the cellular compartments become engorged with fluid, these sacs burst and liberate the desired substance. With respect to the salt tablet, this mechanism results in a solution time of about 60 to 80 minutes for a ten grain tablet. When the tablet is completely dissolved, the cellular stroma of the impregnating film remains and is eliminated from the system in this form."

3. We purposely place the word *shellac* in quotation marks. While there was testimony on behalf of the plaintiff to the effect that the defendant's impregnant was shellac, there was no admission during the course of the trial that this was so and the report as to the accused film's composition, required by the court to be filed beforehand *in camera*, was never opened.

did the court in the Royal Typewriter case, in passing upon the issue of validity on the record before us. There are no findings as to validity and the question is neither raised nor briefed on this appeal. As a consequence, we are disinclined formally to determine validity without the benefit of argument and the District Court's exercise of its judgment, or to return the case for consideration of that question.[4] We therefore confine our comments here to the problem of infringement.

The plaintiffs argue in their main brief that the patented and the accused tablets are equivalent; that the trial court recognized this; that specific as well as generic patents are entitled to a reasonable range of equivalents; that the court's conclusion that the patent has no range at all is therefore error; that a patent claim is to be construed in the light of the substance of the advance contributed by the invention; that Consolazio's approach of controlled release was radically different from that of the past art; that he reduced this theory to practice with a stroma of thin permeable dialyzing film; that the choice of the material forming the film was only a matter of preference; that the invention did not lie in the choice of film material; that it was essentially a mechanical rather than a chemical improvement; that the patent's own disclosure is in broad terms and does not teach that cellulose nitrate and cellulose acetate are the only effective film-forming materials; that the claim was finally allowed because it was more specific as to the physical properties of the structures than the earlier claims; that throughout the prosecution of the patent Consolazio urged the novelty of his tablet in physical structure, operation and results; that the patent is not entitled to a range of equivalents which would embrace every material which might be used to form a thin permeable dialyzing film but only those which are cellulose nitrate, cellulose acetate, or factually equivalent

thereto; that there was no disclaimer by the applicant as to choice of film-forming material; and that the district court gave undue and misdirected emphasis to the word "consisting" as used in the allowed claim.

The defendant's response is that the patent in suit is not a pioneer but is one which emerged in a crowded art; that the prior art discloses the presence of film-forming materials not only as coating for the entire tablet (Davenport No. 617,956; Donard No. 874,310; Miller No. 2,011,587, and Kuever No. 2,373,-763), but as coating for individual particles which make up the tablet (Davenport, supra; Donard, supra; and Andersen No. 2,410,417); that the claim of the patent necessarily measures its invention; that the patentee narrowed his claim in the Patent Office in order to gain its allowance and cannot now, through the doctrine of equivalents, recapture what was disclaimed; that he is subject to file wrapper estoppel; and that in any event the use of the word "consisting" in the claim and its reference to cellulose acetate and cellulose nitrate is restrictive and operates to exclude all substances not belonging to that group.

The plaintiffs' answer to these positive arguments of the defendant is that the invention was a radically new approach to the problem; that the prior art revealed only thick impermeable, nondialyzing coatings placed on either tablets or their granules in order to achieve different results than those sought here; that whatever crowded character there was in the prior art did not relate to the substance of this invention; that the accused tablet does not eliminate any element of the patented combination but merely substitutes a different substance, equivalent in purpose and result, for cellulose acetate or cellulose nitrate; that this is a case for the application of the doctrine of equivalents; that the recital of specific materials in the claim

4. See Govero v. Standard Oil Co., 8 Cir., 192 F.2d 962, 963–964; Publicity Building Realty Corporation v. Hannegan, 8 Cir., 139 F.2d 583, 587.

was merely to satisfy formal requirements of the Patent Office; that the earlier rejected claims were just as specific regarding the identity of the impregnating material and hence its mere mention could not have been the trigger which released the patent; that the novelty was in the physical structure and operation rather than in identity of the film; and that the inventive combination of the claim in suit is introduced by the word "comprising" and not by the word "consisting", and hence any rule of restriction applying to the use of the latter word is not applicable here.

We have spelled out these respective contentions because they clearly reveal the points of conflict between the litigants. The plaintiffs' case rests on the proposition—admittedly unavoidable so far as they are concerned—that the substance of the invention and the patent must be the claimed new approach to the problem of salt intake, namely, the commencement of salt release upon ingestion and the continuance of salt release at a controlled rate through the use of a thin permeable film enveloping the salt granules and subject to dialytic action. The defendant does not deny that the patent involves a film with characteristics of this kind. If then Consolazio's patent is valid and applies to all thin permeable dialyzing films, or at least to those which are factually equivalent to cellulose nitrate and cellulose acetate, it could follow that the accused tablet, with its substitution of "shellac", does not eliminate a combinational element and does infringe. The case, therefore, pivots on the determination of just what the patent covers and comes down to the following:

Does the patent's sole allowed claim by its very language confine its reach to films of the cellulose acetate and cellulose nitrate group?

If so, is this a proper case for the application of the doctrine of

equivalents and does that doctrine then afford this patent protection against the accused tablet?

We discuss these in order.

■■■ 1. *The reach of the patent.* There are certain well established general rules which perhaps should be mentioned for background: (a) In determining whether an accused product infringes a patent "resort must be had in the first instance to the words of the claim". Graver Tank & Mfg. Co. v. Linde Air Co., 339 U.S. 605, 607, 70 S. Ct. 854, 855, 94 L.Ed. 1097; General Bronze Corp. v. Cupples Products Corp., 8 Cir., 189 F.2d 154, 158; Willis v. Town, 8 Cir., 182 F.2d 892, 893. (b) If the "accused matter falls clearly within the claim, infringement is made out and that is the end of it". Graver Tank & Mfg. Co. v. Linde Air Co., supra, 339 U.S. at page 607, 70 S.Ct. at page 855. But, as this court has said, "that which is not literally within the claims does not infringe". Street v. Apel, 8 Cir., 239 F. 2d 581, 589. (c) The word "comprising" in the patent law is an open-ended word and one of enlargement and not of restriction. "Claim 17 includes the expression 'loose granules of a natural material of the group comprising wood and grain'. The word 'comprising' does not exclude other materials besides wood and grains". Ex parte Dotter, 12 U.S.P.Q. 382, 383-384. (d) In contrast, the word "consisting" is one of restriction and exclusion. " * * * (T)he words 'consists of' in claim 3 limit the gases of the tube, so far as claim 3 is concerned, to argon and mercury vapor". Claude Neon Lights v. Rainbow Light, 2 Cir., 90 F.2d 959, 961; Ex parte Dotter, supra; Ex parte Jones and Swezey, 66 U.S.P.Q. 487, 488-9.[5]

■■■ The application of these rules to the plaintiffs' tablet and to the accused tablet is revealing. There is no question that the latter is, to use the

5. Compare Hoskins Mfg. Co. v. General Electric Co., D.C.N.D.Ill., 212 F. 422, 428, affirmed, 7 Cir., 224 F. 464, and In re Bertsch, 132 F.2d 1014, 1019-1020, 30 CCPA 813.

words of the Consolazio claim, "an internally reinforced sodium chloride tablet"; that it has "compressed granules of sodium chloride"; that it has "an internally disposed cellular stroma of a thin, permeable, dialyzing film"; that the cells of the stroma contain the granules of sodium chloride; that "the sodium chloride is rendered slowly available when the tablet reaches the gastro-intestinal tract"; and that the "solution time of the sodium chloride in said tablet in the gastro-intestinal fluids" is within the time range stated in the patent.[6] On the other hand, there is no argument either that the defendant's film of "shellac" is a material which is *not* from the cellulose acetate and cellulose nitrate group. There is thus not complete identity between the two tablets. Therefore, by this first resort, as directed by Graver, to the words of the claim one cannot conclude that the "accused matter falls clearly within the claim" or that infringement automatically follows.[7] The plaintiffs can prevail, therefore, on the infringement issue only

if this is a proper case for the application of the doctrine of equivalents.

2. *Equivalency.* The plaintiffs strongly urge that the combination of elements in the claim and in the accused tablet are, in any event, "factually identical" although "specifically different in chemical identity" (and each with no chemical reaction between the salt and the film) and that the doctrine of equivalents works to their benefit here.

■■ The doctrine is not new to the patent law. It found initial expression in another day[8] and under a statute somewhat different in its requirements as to claims[9] from the one which now prevails.[10] Nevertheless, its age and the nature of the former statute do not deny the doctrine a modern application. Graver Tank & Mfg. Co. v. Linde Air Co., supra, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097.

An equivalent was defined long ago:

" * * * (T)he substantial equivalent of a thing, in the sense of the

6. The evidence indicated that a tablet's dissolution time was a factor within the control of any qualified chemist.

7. The claim's unusual use of the two contrasting words of art, "comprising" and "consisting", merits examination. The plaintiffs urge that the broader word "comprising" is here applicable to "the inventive combination of the claim in suit", that the word "consisting" appears in the claim to introduce the group and that it was added only to satisfy a formal requirement of the Patent Office. They also urge that the word "consisting" has two different uses in patents; that, on the one hand, it is employed to introduce a combination of elements (where the invention resides in the combination); and that it is also used, as here, to introduce an incidental recital of the group disclosed as operable for forming the stroma.

While the matter may not be free from doubt, we are inclined to feel that, as used in this claim, the term "comprising" relates only to the immediately ensuing phrase "compressed granules of sodium chloride". The semicolon following the quoted phrase otherwise occupies no in-

telligible place in the wording of the claim. It would follow that the broader word "comprises" does not carry over to and affect the definition of "the group". The word "consisting", with its narrower import, is then the verbal adjective defining the group. And on the authority of the cases above cited the group, as so defined, is cellulose acetate and cellulose nitrate and nothing more.

In any event, as stated above, we conclude that the language of the patent's sole claim reaches only to cellulose acetate and cellulose nitrate and that the defendant's tablet is outside its terms.

8. Winans v. Denmead, 1853, 15 How. 329, 343, 344, 14 L.Ed. 717.

9. The Patent Act of 1836, § 6, Ch. 357, 5 Stat. 117, required that the claim only "specify and point" out the invention.

10. 35 U.S.C.A. § 112 (the Act of July 19, 1952, Ch. 950, § 1, 66 Stat. 798):
" * * * The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. * * * "

patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape." Machine Co. v. Murphy, 1877, 97 U.S. 120, 125, 24 L.Ed. 935.

The same definition is used today. Graver, supra, at page 608 of 339 U.S., at page 856, of 70 S.Ct.; Willis v. Town, 8 Cir., supra, at page 893 of 182 F.2d. The reason behind the doctrine itself is apparent:

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage —the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. * *

"The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent." Graver, supra, at pages 607–608 of 339 U.S., at page 856 of 70 S.Ct.

But the mere presence of equivalency is not in itself enough to warrant invocation of the doctrine nor does it necessarily equate with infringement. "The Doctrine of Equivalents Revalued", 1951, 19 George Washington Law Review, 491, 494, 503. The requirements of the patent statutes must still, and initially, be met; thus, for example, the doctrine cannot be used to expand the confines of a claim. James P. Marsh Corp. v. United States Gauge Co., 7 Cir., 129 F.2d 161, 165–166. The law review note just cited suggests, pp. 492 and 504, that the doc-

trine's proper application is where, because of formalized practice under present statutes, the claiming "burden upon the patentee is so inequitable as to merit some form of extraordinary relief".

The doctrine may be invoked not only where the patent is a pioneer but also where a secondary invention is involved. Graver, at page 608 of 339 U.S., at page 856 of 70 S.Ct. It may apply to chemical as well as to mechanical patents. And

"What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other, and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." Graver, supra, at page 609 of 339 U.S., at page 856 of 70 S.Ct.

In the same case the Supreme Court speaks in terms of degree when it says, at page 610 of 339 U.S., at page 857 of 70 S.Ct.:

"The question which thus emerges is whether the substitution * * * in view of the technology and the prior art, is a change of such substance as to make the doctrine of equivalents inapplicable; or conversely, whether under the circumstances the change was so insub-

stantial that the trial court's invocation of the doctrine of equivalents was justified."
Compare Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147.

If the doctrine is applicable then the range of equivalents depends upon and varies with the degree of invention. Continental Paper Bag Company v. Eastern Paper Bag Company, 210 U.S. 405, 415, 28 S.Ct. 748, 52 L.Ed. 1122; Miller v. Eagle Manufacturing Co., 151 U.S. 186, 207, 14 S.Ct. 310, 38 L. Ed. 121. Thus, where the patent is a pioneer the patentee is allowed a wide range. Shakespeare Co. v. Perrine Mfg. Co., 8 Cir., 91 F.2d 199, 202. But where the patent is narrow, or the art is crowded, it is given only a correspondingly narrow range. Electrol, Inc., of Missouri v. Merrell & Co., 8 Cir., 39 F.2d 873, 878; Ronson Patents Corp. v. Sparklets Devices, 8 Cir., 202 F.2d 87, 93; R. H. Buhrke Co. v. Brauer Bros. Mfg. Co., 8 Cir., 33 F. 2d 838, 839. We have said on at least one occasion that the range of equivalents available to a patentee may "be so narrow as to be virtually nonexistent". Steffan v. Len A. Maune Company, 8 Cir., 234 F.2d 750, 753. And of course, the doctrine of equivalents cannot be invoked to regain what has been disclaimed in the Patent Office proceedings. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 137, 62 S.Ct. 513, 86 L.Ed. 736. Finally, a finding of equivalence is a finding of fact and a trial court's decision on the issue is not to be disturbed unless clearly erroneous. Graver, supra, at pages 609–610 of 339 U.S., at page 856 of 70 S.Ct.; Rule 52(a), F.R.Civ. P., 28 U.S.C.A.

Judge Learned Hand has summarized well when he said in the Royal Typewriter case, supra, at pages 692–694, of 168 F.2d:

"* * * In these respects a patent is like any other legal instrument; but it is peculiar in this, that after all aids to interpretation have been exhausted, and the scope of the claims has been enlarged as far as the words can be stretched, on proper occasions courts make them cover more than their meaning will bear. If they applied the law with inexorable rigidity, they would never do this, but would remit the patentee to his remedy of re-issue, and that is exactly what they frequently do. Not always, however, for at times they resort to the 'doctrine of equivalents' to temper unsparing logic and prevent an infringer from stealing the benefit of the invention. No doubt, this is, strictly speaking, an anomaly; but it is one which courts have frankly faced and accepted almost from the beginning. All patents are entitled to its benefit to an extent, measured on the one hand by their contribution to the art, and on the other by the degree to which it is necessary to depart from the meaning to reach a just result.

"* * * It is true that a boundary cannot be drawn with precision; and the draftsman of claims is always in something of a dilemma— the dilemma which has led to the very 'doctrine of equivalents' itself.

"* * * It is always a question of degree, and courts have differed, and always will differ, as to the allowable latitude in a given instance. * * *"

Applying these standards to the case before us leads inevitably, it seems to us, to the conclusion that the doctrine of equivalents is of no help to these plaintiffs. We may go so far as to assume that a film of the cellulose acetate and cellulose nitrate group and the defendant's film of "shellac" do, in their respective tablets, perform the same function of controlled retardation of salt absorption. This then comes close to, if not within, the accepted definition of equivalency noted above. But, as the Supreme Court observed in Graver, at

page 609, of 339 U.S., at page 856 of 70 S.Ct., equivalence is not the prisoner of a formula and it not an absolute, and things equal to the same thing in this area may not necessarily be equal to each other. We feel that the plaintiffs seek too much for their patent and we regard the prior art disclosed by the record and the file wrapper as crowded—in spite of plaintiffs' protestations that the crowding does not reach the impregnation aspect and their thin, permeable, dialyzing film—and the Consolazio patent as not a pioneer. In view of the same prior art, we feel that, so far as the doctrine of equivalents is concerned, the defendant's use of shellac was such a change of substance as to make the doctrine inapplicable and that, in the alternative, even if the doctrine does apply, the proper range of equivalents for this patent is a narrow one and, to use the language of Steffan, supra [234 F. 2d 753], is "so narrow as to be virtually non existent" or, to express ourselves perhaps more accurately for our present facts, is of insufficient breadth to include a substance outside "the group consisting of cellulose acetate and cellulose nitrate". Cf. Miller v. Eagle Manufacturing Co., supra.

■ It follows then that, whether or not the District Court stated the law with complete accuracy when it said that the patentee here had disclaimed a number of equivalents and that this patent had "no range of equivalents" [188 F. Supp. 825], its finding that the patent was not infringed by the accused tablet is one not clearly erroneous within Rule 52 and is not to be set aside. General Bronze Corp. v. Cupples Products Corp., 8 Cir., supra, at page 158 of 189 F.2d.

We should and do note plaintiff's great stress and particular reliance on the Graver case to which many references have been made above. That is indeed a landmark decision,[11] although one by a divided court, for if there had been any prior question about the equivalency doctrine's current vitality, that question is now clearly resolved in favor of its continuing life and its applicability in proper situations. The case's facts, however, are significant and deserve emphasis. We feel, as did the Second Circuit in its recent case of International Latex Corp. v. Warner Brothers Co., 2 Cir., 276 F.2d 557, 564, certiorari denied 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47, that the Graver facts disclose "an entirely new type" of invented product; that as a consequence, the facts there are "quite different" from those here, and that they do not direct us "to a contrary conclusion".

While one might ordinarily surmise that there is little or no connection between salt tablets and women's girdles, we nevertheless regard the Latex case as fascinatingly parallel to this one. Spanel, the applicant there, was interested in a uniformity of stresses and found that by using a liquid latex material for the girdle's walls considerably thicker than theretofore employed, he obtained a material having a uniform stretch in every direction. He claimed advantages consisting, among other things, of higher tensile strength, lighter weight, absence of seams, more evenly distributed con-

11. As is perhaps evidenced by the case's travels through the courts. Linde Air Products Co. v. Graver Tank & Mfg. Co., D.C.N.D.Ind.1947, 86 F.Supp. 191; affirmed in part and reversed in part, 7 Cir., 1948, 167 F.2d 531; affirmed in part and reversed in part, Graver Tank & Mfg. Co. v. Linde Air Products Co., 1949, 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672; rehearing granted limited to the questions of infringement of four composition claims and the applicability of the doctrine of equivalents, 337 U.S. 910, 69 S.Ct. 1046, 93 L.Ed. 1722; adherence to prior decision, 1950, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097. Motion to adjudge defendants in contempt granted, Union Carbide & Carbon Corp. v. Graver Tank & Mfg. Co., D.C.N.D.Ind. 1951, 106 F.Supp. 389; reversed, 7 Cir., 1952, 196 F.2d 103, certiorari denied 343 U.S. 967, 72 S.Ct. 1059, 96 L.Ed. 1363. Trial Court's final judgment on damage issues reversed, Union Carbide Corporation v. Graver Tank & Mfg. Co., 7 Cir., 1960, 282 F.2d 653, certiorari denied 81 S.Ct. 692.

stricting effect, a smooth outer surface so that exterior garments would not tend to "ride up" and a reduction in the number of size models required. His application encountered difficulties in the Patent Office. There were repeated rejections of claims on grounds of undue multiplicity and prior art. Finally, after almost 4 years, the patent issued with certain of its claims relating to slightly roughened interior surfaces. The girdles proved very successful commercially. Defendant's girdles, after advice of counsel that they did not infringe, then appeared. These accomplished the departure from smoothness in the interior surface not by abrading, as the patent taught, but by a flocking process. The Second Circuit agreed with the trial court that the patent was valid, although roughening methods and other details had been known, in that the patentee was the first to develop a seamless latex girdle having such features that it produced the desired shaping effect even though not tailored to the particular form. Thus there were concepts of uniformity of force and avoidance of tailoring. But the court went on to hold that the accused product did not come within the plaintiff's claims because of the flocking as distinguished from abrading. The patent owner strongly urged the doctrine of equivalents. It was noted that the two processes served the same objectives, that the results were indistinguishable and that the only question was whether flocking was to be treated as an equivalent under the circumstances there. The court concluded that "it would be incongruous to apply an equitable doctrine" which would "relieve those who have failed to express their complete meaning". Graver was recognized but, as noted, was distinguished. The tribulations of the girdles and those of the salt tablets, strange as it may seem, are similar and we regard that case as pertinent precedent.

This renders it unnecessary for us to consider the additional arguments upon the issue of file wrapper estoppel.

Affirmed.