**DOW CORNING CORPORATION,**
a corporation

v.

**Jack O. CHERTKOF, the Fol-O Corporation, a corporation, and Perma-Rock Products, Inc., a corporation.**

Civ. No. 14152.

United States District Court
D. Maryland.

June 8, 1965.

William A. Marshall and Merriam, Smith & Marshall, Chicago, Ill., and Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

Walter C. Mylander, Jr., Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

Plaintiff, Dow Corning Corporation, hereinafter referred to as "Dow", markets compounds known as Dow Corning 771 and 772 respectively, which are designed to impart water-repellent properties to a wide variety of surfaces. Its complaint is based upon the alleged interference by defendants with its sale of those compounds for use by its customers in the treatment of perlite.

Perlite is an ore found in its crude form in several western states. When heated to 1600°–2100° F, it will expand like popcorn and produce a highly porous, lightweight material known as "expanded perlite". Untreated expanded perlite will rapidly absorb over 350% of its own weight in water, but if certain water-repellent agents are properly applied, to reduce but not eliminate its hydrophilic nature, the treated expanded perlite may be used as an aggregate in lightweight concrete and plaster, and for other purposes in the construction industry.

Defendant Chertkof is the named inventor in U. S. Letters Patent Nos. 2,-727,827 (a composition patent) and 2,-727,829 (a process patent), and is president of the corporate defendants. The Fol-O Corporation is the assignee of rights under the Chertkof patents and licenses them to Perma-Rock Products, Inc., which manufactures and sells a perlite aggregate treated in accordance with the teachings of the Chertkof patents.

Dow seeks a declaratory judgment that the sale by it and the use by its customers of Dow Corning 771 and 772 for the treatment of expanded perlite does not infringe either of the Chertkof patents, and an injunction against defendants interfering with such sale or use.[1] Defendants concede that use of the Dow Corning compounds to treat perlite does not literally infringe either of the Chertkof patents; but defendants invoke the doctrine of equivalents to support their claim of infringement, and have filed a counterclaim for damages and an injunction. For convenience, defendants will be referred to collectively as "Chertkof".

---

[1]. Dow has agreed to save harmless any of its customers who use Dow Corning 772 in the treatment of perlite.

The case is now before the Court on Dow's motion for a summary judgment that the sale and use of Dow Corning 771 and 772 for the treatment of perlite do not infringe either of the Chertkof patents, and for the dismissal of Chertkof's counterclaim.[2]

Summary judgment is appropriate in patent cases on the issue of infringement when there is no genuine issue as to any material fact. Parke Davis & Co. v. American Cyanamid Co., 6 Cir., 207 F.2d 571 (1953); Steigleder v. Eberhard Faber Pencil Co., et al., 1 Cir., 176 F.2d 604 (1949); Smith v. General Foundry Machine Co., 4 Cir., 174 F.2d 147, 151 (1949). In considering the affidavits and other material submitted by the parties, the Court has resolved all disputed facts in favor of Chertkof; so considered, there is no genuine issue as to any fact material to the decision on the motion.

Dow manufactures a variety of organosilicon compounds,[3] including Dow Corning 771 and Dow Corning 772, which are water-soluble, sodium alkyl siliconate solutions. These products are sold for use in a number of fields, in various applications which utilize the ability of the compounds to impart a water-repellent surface.[4] Specifically, plaintiff sells Dow Corning 771 and Dow Corning 772 to processors of perlite[5] to be used for the purpose of reducing the hydrophilic nature of expanded perlite. The treatment consists of spraying a dilute solution of the compound on hot perlite while it is being processed in expanding plants.[6] The sodium methyl siliconate contained in the solution reacts with the moisture and carbon dioxide in the air to form a water-insoluble, water-resistant silicone film on the expanded perlite.

Chertkof claims that this process and the resultant product infringes his '829 process patent and his '827 composition patent.

His '827 patent relates to and claims: "A water wettable lightweight aggregate" comprising expanded particles of volcanic glass (or in one claim, perlite), coated with a fine film of an "air release inhibitor" consisting of specified polyoxyethylene compounds. His '829 patent relates to the "method of making a lightweight mineral aggregate comprising coated particles of perlite" or other volcanic glass. According to the teaching of the '829 patent, the aggregate is made by heating the particles to a temperature sufficiently high and for a time sufficiently long to expand the particles, partially

---

2. Dow's prayer for an injunction is not now before the Court.

3. Organosilicon compounds are classified in three fundamental types: oils, rubber and resins. The water-repellent properties of various organosilicon compounds have made them useful in the textile, paper and construction industries, where they are applied in various ways.

4. The use of water-soluble siliconates to render materials water-repellent is described and claimed in U. S. Patent No. 2,-507,200, entitled "Process for Rendering Materials Water-Repellent and Compositions Therefor", which was issued in 1950, before Chertkof filed the original application upon which his patents were based. Plaintiff holds a license from General Electric, the assignee of Patent No. 2,-507,200, and employs its teachings in connection with Dow Corning 771 and 772. In the narrative portion of its specifications, the General Electric patent states that "although the present invention is particularly adapted to the treatment of cellulosic fibrous materials, it may also be employed with other water-non-repellent bodies, such as glass, porcelain and other ceramics, wood asbestos, etc., to render such materials water-repellent. The procedure is the same as that employed in the treatment of cellulosic materials."

5. While plaintiff has curtailed its marketing of Dow Corning 771 for the treating of perlite to be used in concrete, it still markets this product for the treating of perlite to be used as insulation.

6. As part of the technical assistance offered to its customers, Dow distributes a brochure discussing the treatment of perlite with Dow Corning 772. This brochure suggests that the perlite should be sprayed when its temperature is from 200° to 350° F. It is also suggested that treatment can be carried out at perlite temperature below 200° F if the solution is preheated to 100° to 150° F.

cooling the particles to a temperature in the range of about 400° to 500° F, and then spraying the expanded particles with an air release inhibitor, i. e., with certain specified polyoxyethylene compounds.[7]

The components of Dow Corning 771 and Dow Corning 772 are sodium methyl siliconates, water and trace amounts of methanol. These components are not polyoxyethylene compounds; they do not contain any components which are polyoxyethylene compounds; and they are not converted to polyoxyethylene compounds in the treating process. They differ in structure and physical characteristics from the polyoxyethylene compounds specified in the Chertkof patents.

Chertkof admits that the Dow Corning treating agents are chemically different from the polyoxyethylene compounds, and he does not claim that use of the Dow Corning treating agents literally infringes the Chertkof patents. Chertkof does claim, however, that the doctrine of equivalents establishes an infringement of those patents.

He relies on the statement by the Supreme Court in Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, at 608, 70 S.Ct. 854 at 856, 94 L.Ed. 1097 (1950), that "a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.' Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42 [50 S.Ct. 9, 74 L.Ed. 147]." Dow denies that the use of its product in the way it recommends operates in the same way to produce the desired result, noting (1) the difference in the temperatures at which it recommends that its compounds be applied (see note 6, above) and the temperatures specified in the Chertkof patents (see summary of the teachings of the '829 patent, above), as well as (2) the differences in structure and physical characteristics between its compounds and the polyoxyethylene compounds specified in the claims of the Chertkof patents.

According to the affidavits of defendants' expert, Dr. Walter A. Patrick, the use of Dow Corning 772 in treating perlite produces exactly the same result as that achieved by following the teaching of the Chertkof patents, and "[t]he process recommended for the application of the Dow Corning product is the same mechanical process as that used in the Chertkof patent". Dr. Patrick states that the result is "to leave on the surface of the perlite a molecule with an exposed hydrocarbon tail so that the molecular coating in both cases has an exterior surface which is a hydrocarbon tail radical. * * * To anyone skilled in the art, this is due to the water repellent properties induced by the additives, regardless of the different chemical composition of such additives—and there are many such compounds. The result is a molecular surface exhibiting a hydrocarbon tail. This is the essential element." Dr. Patrick concedes that plaintiff's compounds are chemically different from the polyoxyethylene compounds specified in the Chertkof patents.

The Court accepts for the purposes of this motion Dr. Patrick's factual conclusion that Dow's compounds, though different from the polyoxyethylene compounds specified in the claims of the Chertkof patents, perform substantially the same function in substantially the same way to obtain substantially the same result. The Court does not accept Dr. Patrick's legal conclusion of equivalency based upon his interpretation of the doctrine of equivalents. The Court must decide whether, when the proper legal principles are applied to the facts, Chertkof is entitled to a range of equivalents sufficiently broad to establish infringement in this case.

7. The specifications of the '829 patent state that the inhibitor vaporizes on being introduced to the partially cooled particles so that the resulting vapors mix and make contact with, condense on, and thus coat the particles.

As was said in Parmelee Pharmaceutical Co. v. Zink, 8 Cir., 285 F.2d 465, 471 (1961), " * * * the mere presence of equivalency is not in itself enough to warrant invocation of the doctrine nor does it necessarily equate with infringement. * * * The requirements of the patent statutes must still, and initially, be met; thus, for example, the doctrine cannot be used to expand the confines of a claim. James P. Marsh Corp. v. United States Gauge Co., 7 Cir., 129 F.2d 161, 165–166." In Parmelee, an analogous case, the patentee argued that the combination of elements in the claim and in the accused product (in that case, a tablet), were "factually identical" although specifically different in "chemical identity". But after an analysis of the prior art disclosed by the record and the file wrapper history, the Court concluded that the proper range of equivalents for the patent was a narrow one and did not support the claimed infringement.

It has long been recognized that the range of equivalents depends upon and varies with the degree of invention. Miller v. Eagle Mfg. Co., 151 U.S. 186, 14 S.Ct. 310, 38 L.Ed. 121 (1894); Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908). "What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum." Graver Mfg. Co. v. Linde Air Products Co., supra, 339 U.S. at p. 609, 70 S.Ct. at p. 856.

In Long Manufacturing Co. v. Holliday, 4 Cir., 246 F.2d 95, 100 (1957), cert. den. 355 U.S. 926, 78 S.Ct. 384, 2 L.Ed. 2d 357 (1958), citing Graver, the Court said: "In determining the extent of the range of equivalents, however, we must consider the state of the prior art, the novelty and contribution of the claimed invention, the nature and extent of the differences between the patented and the accused devices, the scope of the claim of the patent and the limitations inherent in it and other surrounding circumstances." In Moon v. Cabot Shops, Inc., 9 Cir., 270 F.2d 539, 543 (1959), cert. den. 361 U.S. 965, 80 S.Ct. 596, 4 L.Ed.2d 546 (1960), after paraphrasing the above passage from Long, the Court added:

"It thus becomes necessary for us to analyze and construe the claims of the patent. In doing so, we are mindful of certain well-established rules of construction. Claims of a patent must be construed not only in the light of the specifications and drawings, but also with reference to the file wrapper history. Whiteman v. Mathews, 9 Cir., 216 F.2d 712, 715. That is, the claims of the patent must always be explained by and read in connection with the specifications and in the light of definitions and admissions made by the applicant in the proceedings in the Patent Office. Westinghouse Electric Corp. v. Hanovia Chemical & Mfg. Co., 3 Cir., 179 F.2d 293, 296–297. And a claim must be read and interpreted with reference to claims which have been rejected. * . * " 270 F.2d at 543.

Although the Court accepts as correct the statement of Dr. Patrick in his affidavit that "Chertkof was the first to demonstrate that imparting water repellency to the surface of the perlite was necessary for the production of stable, strong, perlite cement block", it does not necessarily follow that Chertkof is entitled to a broad range of equivalents. See International Latex Corp. v. Warner Brothers Co., 2 Cir., 276 F.2d 557, 564 (1960), where, although the invention was fairly broad, the applicant had narrowed his claims to overcome difficulties in the Patent Office, and the Second Circuit held that the range of equivalents to which he was entitled had been correspondingly reduced. Accordingly, the file wrapper history of the two Chertkof patents must be carefully examined.

On March 12, 1953, Chertkof filed an application, Serial No. 342,033, for a patent for "Light-weight Aggregate and Method of Producing the Same". On

November 20, 1953, the examiner, without ruling on the merits of the application, required a division of the claim.[8] Therefore, on February 19, 1954, Chertkof filed another application, Serial No. 411,570, covering the "Method of Producing a Light-weight Aggregate", and amended his original application to eliminate the process claims. The original application was the basis for the '827 patent prosecution, while the February 19 application became the basis of the '829 prosecution.

In the '827 patent prosecution, Claim 1 of the original application defined the aggregate as one treated with an air release inhibitor described as "a non-ionic, surface-active, water-soluble organic liquid with a relatively high temperature of volatization". Claims 2 to 5 defined the inhibitor more specifically.[9]

The examiner rejected all of these claims because, inter alia, the definition of the inhibitor was considered too broad and indefinite. With particular regard to the first claim, the examiner ruled:

"Claim 1 is rejected as functional, since it recites a material as made by a particular process, which is not identifiable in the final product. * * [and] for lack of invention over Johnson or Powell, each of which treats porous aggregate with an organic coating material. Powell uses the ester of Montan wax for the treatment of expanded perlite.

"As generic claim 1 has not been found allowable, applicant is required to elect a single disclosed species to which his claims shall be restricted if no generic claim is finally found allowable. Claims 3, 4 and 5 cover three species."

Amendment B cancelled claims 1 to 5 and substituted claims 7 through 12. This amendment eliminated the generic claims, and restricted the claims to the elected species. Claim 10 (the only one finally allowed) defined the treating agent as:

"an air release inhibitor consisting of a non-ionic, surface-active, water-soluble polyoxyethylene thioether liquid; said inhibitor having the formula $(OCH_2CH_2)xS$, where x is an integral number greater than 2 and having a maximum value of 30."

Without any action by the examiner on Amendment B, and in a further attempt to place the application in allowable form, Chertkof submitted Amendment C, which cancelled all claims except claim 10 and added a number of new claims. The new claims were allowed by the examiner as claims 2 to 10 of the '827 patent, claim 10 becoming claim 1.

The claims as finally allowed met the examiner's previous objections by following the election of species made in Amendment B and by more fully describing the treating agent. The air release inhibitor was described as consisting of specified polyoxyethylene compounds.[10]

---

8. The examiner ruled that those claims directed to a building material consisting of expanded perlite treated with certain non-ionic substances had to be separated from the claim covering a particular method of expanding and coating particles with vaporized non-ionic compounds.

9. These claims described the inhibitor as: "said inhibitor being a member chosen from the group consisting of alkyl aryl polyether alcohols, alkyl aryl polyethoxy ethers and polyoxyethylene thioethers." (Claim 2)
"an air release inhibitor comprising an alkyl aryl polyether alcohol." (Claim 3)
"an air release inhibitor comprising an alkyl aryl polyethoxy ether." (Claim 4)

"an air release inhibitor comprising polyoxyethylene thioether." (Claim 5)

10. This inhibitor is variously described in the claims as follows:
" * * * an air release inhibitor consisting of a liquid, non-ionic, surface-active, water-soluble polyoxyethylene thioether; said inhibitor having the formula $(OCH_2CH_2)xS$, where x is an integral number greater than 2 and having a maximum value of 30." (Claims 1 and 2)
" * * * an air release inhibitor, said inhibitor being a stable, high boiling, non-ionic, surface-active, water-soluble organic liquid consisting of a polyoxyethylene compound selected from the class consisting of an alkyl aryl polyoxyethylene

The '829 patent prosecution followed similar lines. The initial claims defined the treating agent as:

"a non-ionic liquid" (Claim 1)

"a non-ionic surface-active organic liquid" (Claim 2)

"a non-ionic surface-active water-soluble organic liquid" (Claim 3)

"a non-ionic surface-active water-soluble organic liquid" (Claim 4)

"a non-ionic surface-active water-soluble liquid chosen from the group consisting of alkyl aryl polyether alchohols, alkyl aryl polyoxyethers, and polyoxyethylene thioethers" (Claim 5)

After these claims and later broad claims had been rejected, Chertkof submitted a new set of claims numbered 13–22, which eventually were allowed and issued as claims 1–10 of the '829 patent. In each of these claims, the treating agent employed in the claimed process was defined as a "polyoxyethylene compound selected from the class consisting of an alkyl aryl polyoxyethylene alcohol, and alkyl aryl polyoxyethylene ether and a polyoxyethylene thioether", or as one of the members of that class.

During the '829 prosecution it was recognized that there was nothing new in heating perlite in order to expand it and that the prior art attempted to meet the same problems which Chertkof recognized by adding to the lightweight aggregate air release inhibitors either in the form of a powder or of a liquid spray. The examiner in his first rejection of the application noted:

"Powell discloses a process comprising flash heat expanded perlite, partially cooling the heat expanded perlite, admixing therewith a dispersion of finely divided particles of paraffin or Montan wax, and cooling the coated perlite. Miner teaches that it is old to heat expanded vermiculite and simultaneously impregnate the vermiculite with substances such as paraffin oil. No invention is presented by substituting an organic liquid such as the paraffin oil of Miner for the paraffin or Montan wax in the Powell process." [11]

alcohol, an alkyl aryl polyoxyethylene ether, and a polyoxyethylene thioether, said inhibitor having a flash point in the range of 400 to 500° F., a fire point between 500 to 600° F., and low vapor pressure at room temperature in said flash point range and decomposable at a temperature in the vicinity of said fire point." (Claims 3 and 4)

" * * * inhibitor is an alkyl aryl polyoxyethylene alcohol." (Claim 5)

" * * * inhibitor is an alkyl aryl polyoxyethylene ether." (Claim 6)

" * * * inhibitor is a polyoxyethylene thioether." (Claim 7)

" * * * inhibitor is an ethyl phenyl polyoxyethylene alcohol." (Claim 8)

" * * * inhibitor is a propyl phenyl polyoxyethylene ether." (Claim 9)

" * * * an air release inhibitor, said inhibitor being a stable, high boiling, non-ionic, surface-active, water-soluble organic liquid consisting of a polyoxyethylene compound selected from the class consisting of an arkyl aryl polyoxyethylene alcohol $R(OCH_2CH_2)xOH$ an alkyl aryl polyoxyethylene ether $R(OCH_2CH_2)x$, and a polyoxyethylene thioether $(OCH_2CH_2)xS$, where R represents an alkyl aryl portion and x indi-

cates that the compound is a polymer, said alkyl aryl portion comprising a benzene ring having at least one alkyl group substituted therein, said alkyl group having from 1 to 5 carbon atoms, said inhibitor having a flash point in the range of 400 to 500° F., a fire point between 500 to 600° F., and a low vapor pressure at room temperature, and said inhibitor being vaporizable at a temperature in said flash point range and decomposable at a temperature in the vicinity of said fire point." (Claim 10)

Amendment C also added to the narrative section of the patent the following paragraph: "As is apparent, all of the above agents contain the portion: $(OCH_2CH_2)x$, which may suitably be designated a polyoxyethylene portion, and the agents themselves may conveniently be referred to as polyoxyethylene compounds."

11. Although not cited during the prosecution, the Watts patent of 1945, No. 2,463,-927, entitled "Lightweight Coated Aggregate and Method of Making", notes most of the problems to which the Chertkof invention is directed. Watts claimed to solve these problems through pre-treat-

In the remarks attached to Amendment A, the attorney for Chertkof attempted to distinguish the prior art cited by the examiner on the ground that the '829 process "treats the expanded mineral aggregate at high temperature with an inhibitor in gaseous form".[12] Nevertheless, the examiner rejected all of the generic claims contained in the original '829 application and in Amendment A thereto. The fact that Chertkof taught the use of an inhibitor in gaseous form was considered not sufficient to support the claimed process unless the treating agent was more specifically defined than it had been in the claims up to that time.

To meet the examiner's objections Chertkof followed the same procedure he followed in the '829 application. He withdrew his generic claims and filed new limited claims. In these new claims, which were allowed, it was provided that the inhibitor be introduced when the perlite or other material is at a temperature which causes the inhibitor to "vaporize". But, most importantly for the purposes of this case, in all of the claims which were allowed, the inhibitor was limited to specified polyoxyethylene compounds.

In summary, the file wrappers show that Chertkof originally made very broad claims in both applications. Those claims were rejected by the examiner, who cited the prior art, particularly the Powell and the Miner patents. It is immaterial whether the examiner was right or wrong in his objection. Carter Products, Inc. v. Colgate Palmolive Co., 4 Cir., 269 F.2d 299, 301–302 (1959), citing Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 137, 62 S.Ct. 513, 86 L.Ed. 736 (1942). See also I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 443–444, 47 S.Ct. 136, 71 L.Ed. 335 (1926). The important fact is that as a result of the objections of the examiner Chertkof limited his claims, finally claiming as his inhibitor only certain polyoxyethylene compounds.

If he had not so limited his claim, he would have been entitled to a broad range of equivalents. But having limited his claims and accepted a patent, he greatly restricted the range of equivalents upon which he can now rely.

█ The essence of the doctrine of equivalents is "that one may not practice a fraud on a patent". Graver Mfg. Co. v. Linde Air Products Co., 339 U.S. at 608, 70 S.Ct. at 856. Chertkof does not contend that Dow Corning 771 and 772 were developed in an effort to circumvent his patents. The Dow products are siliconates, which Dow has developed and sold for a wide variety of purposes.

While the doctrine of equivalents operates to relieve those who have failed to express their complete meanings, International Latex Corp. v. Warner Brothers Co., 2 Cir., 276 F.2d 557, 564 (1960), there was no such failure in this case. After fully describing the scope of his invention, Chertkof deliberately narrowed the broad claims which had been disallowed and accepted a patent which was limited to a particular class of inhibitors. Dow's products admittedly do not fall in that class.

ment of the lightweight aggregates by adding to the aggregate, at the point of its manufacture, a chemical agent sufficient to inhibit the release of air. The Watts patent uses as a treating agent pine wood resin to form a water-proofing film on the surfaces of the lightweight aggregate "and thereby effectively reduce the capillary absorption of moisture by the formed products". The Watts patent talks about the characteristics of inhibitors or treating agents, and in its specifications claims "high efficiency as a film forming agent and surface tension-reducing agent for the liquid phase of the hydraulic mixture."

12. The specification, filed with the original application and included in the patent without substantial change, stated: It is "claimed by this invention that if the lightweight aggregates are treated by an inhibitor or air entrainment agent in the gaseous state, the microscopic surfaces will be coated and the surface tension reduced so that the capillary attraction to these surfaces has been increased. Coating of lightweight products by a gaseous inhibitor furnished the inhibitor in the finest state of particle size, so that every microscopic surface of the lightweight aggregate can be contacted by this inhibitor."

Chertkof cannot invoke a range of equivalents sufficiently broad to show that the sale or use of Dow Corning 771 and 772 infringe either of his patents. Dow's motion for summary judgment on the issue of infringement and for dismissal of the counterclaim must be granted.