**BARRY FIALA, INC., Plaintiff,**

v.

**CARD USA, INC. Defendant.**

**No. 02–2167 M1/A.**

United States District Court,
W.D. Tennessee,
Western Division.

Dec. 4, 2003.

---

Richard M. Carter, Esq., Martin Tate Morrow & Marston, Russell H. Walker, Esq., Walker McKenzie & Walker, P.C., Lauri M. Hays, Martin Tate Morrow & Marston, Memphis, TN, Barry E Bretschneider, Morrison & Foerster, LLP, McLean, VA, for Barry Fiala, Inc.

W. Michael Richards, Esq., Baker Donelson Bearman Caldwell & Berkowitz,

Memphis, TN, Melvin K Silverman, Melvin K. Silverman & Assoc., P.C., Newark, NJ, Philip A. Duvalsaint, Philip A. Duvalsaint, P.A., S. Tracy Long, Melvin K. Silverman & Assocs., P.C., Ft. Lauderdale, FL, for Card USA, Inc.

Tu M. Pham, U.S. Magistrate Judge, Memphis, TN, pro se.

## MEMORANDUM OPINION AND ORDER ON MARKMAN MOTION

McCALLA, District Judge.

Before the Court is the parties' request for claim construction pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995), *aff'd.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Both parties filed briefs on June 2, 2003.[1] The Court additionally held a hearing on June 20, 2003, during which both parties had an opportunity to present their positions. For the reasons stated herein, the Court construes Claims 29 and 30 as follows.

## I. Background

On July 6, 1999, the Patent and Trademark Office ("PTO") issued U.S. Patent No. 5,918,909 (hereinafter the " '909 patent") to inventors Barry Fiala and Ronald Blythe Selby, who assigned the patent to Plaintiff Barry Fiala, Inc. ("Fiala"). Patent '909 is entitled "Package for Card with Data Encoded Strip and Method of Using Same." U.S. Patent No. No. 5,918,909 (issued July 6, 1999). As the name suggests, the invention teaches a package for holding a data-encoded card and a method of using said card-package combination to activate a metered account. *See id.*

Fiala brings this action asserting that Defendant Card USA, Inc. ("Card USA") willingly and knowingly infringed the '909 patent. Complaint at ¶ 9. Specifically, Fiala alleges Card USA infringed the patent by developing a product which used the patented method for activating a card-package combination at the point of purchase.[2] Before the Court can consider Fiala's allegations of infringement, it is required to construe the scope of the '909 patent.

## II. Standard of Review

■ It is well established that patent infringement requires a two-step analysis. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1365 (Fed.Cir.2002). The first is the claim construction step during which a Court determines the meaning and scope of the claims asserted to be infringed. *Id.* In construing a claim, the Court relies on the intrinsic evidence, namely: (1) the language of the patent claims, (2) the patent specifications, and (3) the prosecution history. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324–25 (Fed. Cir.2002); *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1105 (Fed. Cir.1996). Only if an analysis of the intrinsic evidence alone is insufficient to resolve any ambiguities over the disputed terms, will it be appropriate for the Court to rely on extrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996) ("In those cases where the public record unambiguously describes the scope of the patented invention, reli-

1. On August 27, 2003, the Court granted Plaintiff leave to file a Corrected Response to Card USA's Motion. The Court has considered both of Plaintiff's briefs.

2. The disputed product, Card USA's Tracfone card, also involves a card-package combina-

tion that is activated at the point of purchase. *See* Def.'s Ex. 1. The card, however, has a distinctive feature. Card USA's Tracfone package has a flap that folds over the bottom portion of the package to expose the magnetic strip.

ance on any extrinsic evidence is improper."). *See also Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1216 (Fed.Cir. 1995); *Hormone Research Found. Inc. v. Genentech Inc.,* 904 F.2d 1558, 1562 (Fed. Cir.1990).

Once the Court has properly construed the claims, it can then turn its attention to the infringement analysis. *CCS Fitness,* 288 F.3d at 1365. As part of this step, the Court will compare the accused device to the claimed invention to determine whether the accused device contains all the limitations, either literally or by the equivalents, in the patent. *Id.* (citing *Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 988 (Fed.Cir.1999)). This step, however, can only take place after the Court has construed the disputed claims. Accordingly, the Court turns its attention to the claims of the '909 patent.

### III. The '909 Patent

The '909 patent "relates, in general, to packaging for well-known prepaid debit cards." U.S. Patent, Column 1:26–27. Such credit cards are associated with a prepaid metered account, which is debited when the card is purchased. *Id.* at Column 1:27–29. The '909 patent provides an inventive method for packaging these data-encoded cards, allowing vendors to activate the cards while they are still within the package. *See id.,* Column 2:28–46; Column 19:30–35. "Once activated, the metered account is credited with a certain predetermined balance, and any person having the correct personal identification number (the "PIN number") can subsequently be provided with goods or services having a total value equal to the predetermined balance simply by providing the PIN number each time a transaction is desired." *Id.,* Column 4:65–5:4.

As explained in the patent, prior to the invention, debit cards were sold pre-activated, or "hot". *Id.* at Column 1:37–52;

Pl.'s Brief at 9. However, unfettered access to the cards made theft a problem for retailers, who were forced to keep the cards under lock. *Id.* at Column 1:37–52. This approach was undesirable because customers could not easily access and handle the cards prior to purchase. Pl.'s Brief at 9. Fiala's patent solved this problem by creating a card and package combination that could be displayed on shelves freely accessible to customers. *Id.;* U.S. Patent, Column 18:43–53. The patented card-package combination allows the cards to remain inactive, or "cold", until the point of purchase. According to Fiala, this invention has led to the creation of a whole industry.

### IV. Analysis

#### A. The Disputed Claims

■ As with all patents, the '909 patent is embodied in a document which contains several parts, including an abstract, a background, a detailed description, drawings and claims. The claims are the most important section of the patent document, as they actually "define the scope of the patentee's rights." *Markman,* 517 U.S. at 372, 116 S.Ct. 1384. A claim may cover a process, a machine, a manufacture, a composition of matter, or a design, but never a function or a scientific explanation. *Id.* at 373, 116 S.Ct. 1384 (citing 6 Limpscomb § 21:17, at 315–16).

In this case, only two claims are at issue: claims 29 and 30 (hereinafter "Claim 29," "Claim 30" and "Claims"). Both claims detail how the card-package combination is used to activate the metered account. Claim 29 articulates the activation method, while Claim 30 specifies how the metered accounts are accessed once they have been activated.

Claim 29 provides the following:

A method of using the first card and package combination as recited in Claim

12 to activate a metered account, said method comprising the steps of:

(a) encoding a first identification number onto said data-encoded strip;

(b) associating a first representation of said first identification number with said metered account within a processing apparatus;

i. then using a data-encoded strip reader to read said encoded first identification number from said exposed data-encoded strip while said first card is secured to said first panel;

ii. then transmitting a first characterization of said first identification number from said data-encoded strip reader to said processing apparatus;

iii. then using said first characterization of said first identification number to identify said metered account by said processing apparatus;

iv. then activating said meted account by said processing apparatus; and

(c) crediting said metered account with a certain predetermined balance.

U.S. Patent, Column 24:60–25:16.

Claim 30 incorporates the method of Claim 29 and adds additional specifications. More precisely, the text claims as part of the '909 patent:

The method of [C]laim 29 which further comprises the steps of:

(a) associating a second representation of a second identification number with said metered account within said processing apparatus; then

(b) using a second characterization of said second identification number to identify said metered account by processing apparatus; and then

(c) providing access to services and debiting said balance of said metered account for said providing of said services.

U.S. Patent, Column 25: 17–27.

As the text of both disputed Claims suggest, Claim 29 and 30 are dependent claims. That is both Claims incorporate another Claim that affects its scope. In this case, Claim 29 depends on Claim 12, which details the structure of the card-package combination required for point of sale activation.[3] Claim 30, in turn, depends on Claim 29 to incorporate the activation method to the claimed process.[4] This relationship between Claims 29 and 30 makes Claim 30 also dependent on Claim 12. Accordingly, the construction of independent Claim 12 becomes a crucial part of the analysis before the Court.

### B. Claim 12

Both parties have devoted a considerable portion of their briefs and oral arguments to the proper construction of Claim 12. Indeed, Card USA solely presented arguments for the proper construction of Claim 12, and did not address either of the two Claims at issue in this lawsuit.[5] *See,*

---

3. The preamble to Claim 29 specifies "a method of using the first card and package combination as recited in claim 12 to activate a metered account ...," U.S. Patent, Column 24:60–62.

4. Claim 30 incorporates "the method of claim 29," U.S. Patent, Column 24:17–18.

5. *See also* Tr. of Hearing (June 20, 2003) at 29 ("Since we have no basic difference with the defendant as to the meaning of [C]laims 29 and 30, there's simply no reason to waste the [C]Bourt's time in the those areas. So the focus of this case, or certainly of this hearing is certainly on the meaning of certain terms in Claim 29. Obviously, if there is a satisfactory—what the defendant believes is a satisfactory construction of Claim 12, then we're perfectly happy with the plaintiff's construction of Claims 29 and 30.").

*e.g.,* Def.'s Brief at 3–4, 9 (characterizing Claim 12 "as the only issue of claim construction before the Court"). Given the importance of independent Claim 12 to the proper resolution of this case, the Court begins its analysis by construing the scope of the card-package combination that is at the center of this dispute. The language of Claim 12 states:

> In combination:
>
> a first card generally defining a plane and including an exposed data-encoded strip; and
>
> a package including a first panel, said first panel having an outer perimeter; said first card being secured to said first panel so that at least a portion of said data-encoded strip is exposed and displaced externally remote from a portion of said outer perimeter of said first panel in a direction substantially parallel to the plane of said first card.

U.S. Patent, Column 22:40–49.

Neither party disputes that Claim 12 necessitates the combination of two elements: a card and a package.[6] Indeed, the parties agree on the first element required for this patented combination (i.e., the card). There is no dispute that the first subparagraph of Claim 12 describes a card of any outline shape, which includes a data-encoded strip. *See* Pl.'s Brief at 19–20; Tr. at 31. Rather the dispute centers on the details embodied in the second sub-element requiring that the data-encoded strip be attached in a particular manner to the package. Specifically, the parties disagree as to the (1) meaning of the term

"secured" and (2) the exact scope of the requirement that at least a portion of the data-encoded strip be exposed and displaced externally from the package.

### 1. Secured

■ In its brief, Fiala argues that the term "secured" should be interpreted broadly to mean "held fast."[7] In support of its position, Plaintiff relies on Webster's dictionary, as well as the patent prosecution history. Pl.'s Brief at 23–24. *See also CCS Fitness,* 288 F.3d at 1366 (explaining that although dictionary definitions do not form a part of the integrated patent document, they are relevant in helping to establish a term's ordinary meaning). Interestingly, Card USA also predicates its argument on the prosecution history. However, Card USA uses the same evidence to propose a narrower construction of the term "secured". According to Card USA, "secured" ought to be construed as meaning more than just holding fast, but actually providing a security aspect.[8] Def.'s Brief at 15–19.

■ The Court's analysis begins, as it must, with the language of Claim 12. *Teleflex,* 299 F.3d at 1324–25. Words in a claim are generally given their ordinary and customary meaning, unless the patentee has chosen to be his/her own lexicographer and explicitly defined the terms in the specifications. *Vitronics,* 90 F.3d at 1582; *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir. 1996) ("A technical term used in a patent

---

6. The parties agree that the preamble "in combination" acquires its ordinary meaning.

7. Fiala advanced the same argument during the *Markman* hearing. See Tr. at 14–15.

8. During the hearing, Card USA articulated this argument more precisely. Defendant urged this Court to construe the term "secured" as a synonym for "retaining"; using

the meaning for retaining that Defendant believes Fiala set forth in the specifications and during the prosecution process. Tr. at 47. According to Card USA, "retaining", does not relate only to a mechanism for attaching the card, such as a rivet, but actually includes "everything that the rivet [would do] in terms of [showing evidence of tampering] and/or [obscuring the PIN]".

document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention . . . .").

Because Mr. Fiala did not define the term "secured", the Court must ascertain whether the this word must be given its ordinary meaning or discern a specific meaning for the term.[9] Although Fiala correctly notes that one of the ordinary meanings of the word secure is to "hold fast", the same source that Fiala urges the Court to rely on includes an alternative meaning which supports Card USA's position. Pl.'s Brief at 13. Specifically, the version of Webster's Dictionary Fiala introduced during the hearing also defines the word "secured" as relieving exposure from danger or making safe. *See Webster's Ninth New Collegiate Dictionary* 1062 (1990).[10] This definition is in line with Card USA's argument that the means for securing were intended to protect the customer from purchasing a card that had been tampered with. Def.'s Brief at 15. Given the inconclusive nature of this source, the Court turns its attention to the other sources of intrinsic evidence in search of guidance. *CCS Fitness*, 288 F.3d at 1366 (explaining that a court may restrict a claim terms ordinary meaning when the intrinsic evidence shows that the "the patentee distinguished the term from prior art on the basis of the particular embodiment").

The Court first considers the specifications, which are the written description of the invention, as well as the instructions on how to practice the '909 patent and the drawings depicting the preferred embodiments. *Vitronics*, 90 F.3d at 1582. Here, the specifications indicate that Fiala conceived of the invention as incorporating a security aspect. For instance, in the brief summary of the invention, Fiala identifies the security aspect as one of the objectives of the '909 patent.[11] Similarly, the Detailed Description of the Invention, repeatedly describes embodiments of the '909 patent in which the retaining means incorporate tamper evident mechanisms that allow consumers to detect when the PIN number has been surreptitiously viewed. *See, e.g.*, U.S. Patent, Column 6: 14–40 (explaining that preferably the rivets "comprises tamper evident means for indicating that a surreptitious attempt has been made to view the PIN number"); U.S. Patent Column 7:7–22 (noting that the preferred means for the embodiment include tamper evident means); Column 8:45–52 (describing a retaining mechanism that protects customers from buying cards that have been tampered with); Column 9:48–52 (explaining that the embodiment includes a tamper evident mechanism); Column 10:26–32 (describing the particular embodiment as "also providing tamper-evident means"); Column 12: 46–58 (explaining that the sixth embodiment, which uses

---

**9.** *See* Tr. at 8 ("We don't have any language that says this is our invention . . . . This disclosure is fairly broad.").

**10.** The definition reads:

1 a: to relieve from exposure to danger: act to make safe against adverse contingencies, b: to put beyond hazard of losing or of not receiving: GUARANTEE, c: to give pledge of payment (to a creditor) or of (an obligation), 2 a: to take (a person) into custody: hold fast: PINION, b: to make fast: SEAL, 3 a: to get secure usu. lasting

possession or control of, b: BRING ABOUT, EFFECT, 4 to release (naval personnel) from work or duty . . . .
*Webster's* at 1062.

**11.** The specifications declare that "[i]t is another object of the present invention to provide a package that obscures from view a PIN number displayed on a prepaid debit card and includes a tamper evident device to indicate whether someone has attempted to view the PIN number on the card." U.S. Patent; Column 3:7–12.

glue, instead of rivets also "provides clear evidence of tampering with the package").

■ Fiala acknowledges including a security element in its description of the invention. Rather, in its Corrected Response Brief Fiala urges the Court to consider the retaining means (i.e., rivets, glue, etc) as merely articulating possible embodiments of the invention.[12] Pl.'s Corrected Resp. at 2–4. To this end, Fiala relies on *CCS Fitness v. Brunswick Corp.*, 288 F.3d at 1366.

■ In this case, the Court of Appeals for the Federal Circuit considered the appropriate role the specifications and the prosecution history should play in claim construction. *Id.* at 1367–68. Although as Fiala correctly points out, the Federal Circuit found that the infringer cannot narrow a term's ordinary meaning by simply pointing to the preferred embodiment, Fiala overlooks the fact that the Federal Circuit explicitly noted that a "claim will not carry its ordinary meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment . . . or described a particular embodiment as important to the invention." *Id.* at 1366. *See also SciMed.*, 242 F.3d at 1343–44 (holding that "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question"); *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1581 (Fed.Cir.1997) (refusing to give the word "passage" its ordinary meaning and using the specifications to narrowly construe the term).

In this case, the specifications make evident that Fiala identified the safety aspect as an important element of the invention. The fact that every embodiment incorporates a safety aspect cannot be dismissed as a mere coincidence. The safety aspect of the retaining means is essential to the invention. The prosecution history lends further support to this interpretation.

The record shows that the PTO Examiner originally rejected Claim 12 "under 35 U.S.C. 102(b) as being anticipated by [two prior patents, the] McIntire et al. and Hill et al [inventions]."[13] Pl.'s Ex. B at 142. In response to this communication from the PTO, Fiala submitted two subsequent amendments to Claim 12. The first amendment altered other language in the Claim, but left intact the term "retaining means." *Id.* at 147. The examiner once again rejected Claim 12 forcing Fiala to submit a subsequent amendment. *Id.* at 150–52. It was in this second amendment filed in January of 1999 that Fiala amend-

---

**12.** Fiala is correct that one of the "cardinal sins of patent law" is to read "a limitation from the written description into the claims." *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys. Inc.*, 242 F.3d 1337, 1340 (Fed.Cir. 2001).

**13.** The Hill and McIntire patents showed a carrier panel holding an information card with a magnetic stripe, in which the information card sat atop of and wholly within the perimeter of the carrier panel so that the magnetic stripe could be encoded with data, such as happens with well-known credit card mailing carriers and the like. In the Hill and the McIntire references, the card and its magnetic stripe, sitting atop the carrier panel, were displaced an infinitesimal distance above the carrier panel in a direction substantially perpendicular to the plane of the card.

Pl.'s Brief at 15. *See* U.S. Patent 5,494,544 (Feb. 27, 1996); U.S. Patent 5,281,799 (Jan. 25, 1994).

ed the language of Claim 12 to include the term secure. *Id.* at 155.

The amendment changed the phrasing of the Claim from:

a package including a first panel, said first panel having an outer perimeter; *and retaining means securing* said fist card to said first panel ....

to read

a package including a first panel, said first panel having an outer perimeter; said first card *being secured* to said first panel ....

Pl.'s Ex. B at 172; 186–87(emphasis added).

Fiala asserts that the amendment was intended to broaden the scope of the patent, such that Claim 12 would not be limited to the particular modes of securing the card to the package disclosed in the specification of the patent (e.g., rivets, glue), but would instead cover all available methods for holding the card to the panel.[14] Pl.'s Brief at 23; Tr. at 13–15; 65–67. Fiala, however, fails to provide any cites to the record that would support its characterization of the amendment. In fact, the remarks following the amended Claim un-

dermine Fiala's contention. The prosecution history indicates that Fiala characterized the amendment to the Examiner as helping to distinguish the invention from the prior art. Specifically, Fiala noted that: "[C]laim 12 ... [had] been amended to recite that the first card is secured to the first panel rather than having retaining means securing the first card to the first panel.... Thus distinguish[ing Claim 12] from the prior art with greater clarity and particularity...." *Id.* at 167–68.

These remarks confirm Card USA's position. The only possible manner in which this textual change could distinguish the '909 patent from the prior art is by adding a safety component, as the other Hill and McIntire patents already covered a method for holding a card to a package. In other words, the amendment was used to distinguish the '909 patent from the two existing patents by showing that the Fiala patent offered more than a means for attaching the card to the package; it secured the card such that it would protect customers from purchasing tampered products. Tr. at 48; Def.'s Brief at 15, 18–19.

For this reason, the Court adopts Card USA's proposed construction of the term

---

**14.** As Plaintiff correctly noted during the hearing, "in the world of patent law, ... the word "means" in a claim ... coupled with some language like retaining, it's a signal that that particular limitation or element in the claim is to be interpreted in accordance with [¶ 6] of [§ ] 112 of the Patent Act. That is the section of the Patent Act that says an element in a claim for a combination that recites means for carrying out a given function ...." Tr. at 14. *See also Ethicon, Inc. v. United States Surgical Corp.,* 135 F.3d 1456, 1463 (Fed.Cir.1998) (explaining that means language indicates that the inventor is announcing the means for achieving a certain function).

According to Fiala, Plaintiff changed the "means" language to "signal to the public

that secured to is broader than the retaining means [language]." Tr. at 14:25–15:2. Fiala argues that the purpose of the amendment was to indicate that Claim 12 did not require the card to be attached only by the retaining means listed in the specifications (e.g., rivets, glue and stickers), but had a broader general meaning that encompassed other means outside the ones listed in the embodiment. While the Court recognizes that it is possible that Fiala may have strategically eliminated the phrase "retaining means" to overcome this limitation, the Court does not believe that this change compels Fiala's proposed construction of the term "secured". The intrinsic evidence suggests that Fiala purposefully chose the term secure to convey that a security element was part of the invention.

"secured." The Court holds that one skilled in the art reading the language of Claim 12, the specifications, and the prosecution history, would conclude that the term "secured" encompasses more than a mechanism for holding together, but actually includes a security element. The Court construes the term as meaning "to make safe."

### 2. At Least a Portion of Said Data-Encoded Strip Is Exposed and Displaced Externally Remote from a Portion of Said Outer Perimeter Of Said First Panel in a Direction Substantially Parallel to the Plane of Said First Card

■ During the hearing, and in their briefs, the parties devoted much of the discussion setting forth their arguments to the proper scope of the requirement that a portion of the data-encoded strip be exposed and displaced externally. *Id.* After careful review of the briefs, the exhibits and the transcript of the *Markman* hearing, the Court concludes that there is no real dispute about the proper construction of this portion of Claim 12.[15] Both parties agree that all the words in this subparagraph of Claim 12 take their ordinary meaning.[16]

For instance, the Court concludes that the term "exposed" has its ordinary meaning of open to view, not shielded or protected. *Webster's* at 438. Similarly, the "at least" portion of the phrase takes its ordinary meaning to mean at a minimum. *Id.* at 756. Combined, the phrase requires that, at a minimum, a portion of the data-encoded strip must be open to view.

Additionally, the language of Claim 12 requires that the magnetic strip be "displaced externally". As with the previous terms, the word displaced takes on its ordinary meaning. *Id.* at 365 (defining the word displace as "remov[ing] physically out of position"). The card must be displaced externally, meaning outside, the perimeter of the package. *Id.* at 440. The card is displaced externally remote "from the outer perimeter of said first panel." The term outer perimeter is used in its usual and customary sense to define the outer boundary. *Id.* at 874. In this case,

15. Card USA correctly noted during the hearing that Fiala narrowed Claim 12 to require that the magnetic strip be exposed in order to overcome prior art. Tr. at 32–35. Therefore, there is no doubt that patent '909 excludes products covered by the prior art, where the magnetic strip lies unexposed within the boundaries of the package.

16. Based on its detailed and conscientious review of the record, the Court finds that Card USA does not advance a particular construction of this phrase of Claim 12. On the contrary, Defendant agrees with Plaintiff that Claim 12 requires that the "card having a data-encoded strip must project from some definable ascertainable periphery or outer perimeter of the package or panel holding the card." Tr. at 31. Instead, what Card USA actually asks the Court to do is to identify a particular point in time when the magnetic strip must be exposed. *See* Tr. at 34 (where Card USA argued "[t]his flap [the Tracfone flap] means quite a bit. You have to look at the structure as it is made, as it is initially manufactured, and that if its manufactured to look like Hill and McIntire, it cannot fold. It does not then have this outer perimeter that was incorporated as a limitation at the end of the patent examination process for the express purpose of overcoming the references to Hill and McIntire.").

The Court declines Card USA's request. Defendant's argument goes to the heart of the infringement claim. The language of Claim 12 does not specify particular time when the magnetic strip must be exposed, or demand that one be set. Thus, the Court will not read a time limitation into the text of Claim 12. Card USA must wait until the second stage of the analysis to raise this argument.

the limit of the first panel or the border of the package.

The final requirement details the exact position of the card. Claim 12 demands that the card be placed in a direction "substantially parallel to the plane of said first card." All the terms in this phrase adopt their ordinary meaning. The Court agrees with Fiala that "there is no constraint placed [in this language] as to whether the first panel is coplanar with, or above, or below the first card, only that a portion of the data-encoded strip is outside a portion of the outer perimeter of the first panel in a direction substantially parallel to the plane of the first card." Pl.'s Brief at 25. All that is required is that the data-encoded strip be placed in a position as to be lying parallel to the edge of the package. The specifications confirm this interpretation. All the drawings depict an exposed card with an exposed magnetic strip, where the strip is parallel to the edge of the package. *See* U.S. Patent, Figs. 1, 5, 8, 12, 15, 20, 21, 27, 31, and 33.

In sum, the second subparagraph of Claim 12 requires, at a minimum, that a portion of the magnetic strip on the card be open to view, and that this magnetic strip be parallel to one of the edges of the package.

### C. Claim 29

Having construed Claim 12, the Court turns its attention to the first allegedly infringed Claim. As previously noted, while Claim 12 described the card-package combination, Claim 29 focuses on the activation method for the card. This method necessitates the card-package combination construed in Claim 12. The language of the preamble establishes this relationship. *See* U.S. Patent, Column 24:60–63 ("A method of using the first card and package combination as recited in Claim 12 . . . .").

### 1. A Method of Using The First Card and Package Combination as Recited in Claim 12 to Activate a Metered Account, Said Method Comprising the Steps Of

██ The preamble of Claim 29 explicitly establishes that the Claim concerns a method. The words method and steps indicate that Claim 29 involves various steps in a process claim, which makes Claim 29 subject to 35 U.S.C. § 112 ¶ 6. *See O.I. Corp.,* 115 F.3d at 1582 (explaining the application of 35 U.S.C. § 112 ¶ 6 to steps-plus-function Claims). Here, the method involves at least three steps. The word comprising "is a term of art in patent law . . . signifying an open-ended construction." *SKW Americas v. Euclid Chem. Co.,* 231 F.Supp.2d 626 (N.D.Ohio 2002) (internal citations omitted). "A drafter uses the term 'comprising' to mean 'I claim at least what follows and potentially more.'" *Id.* (citing *Vehicular Techs. Corp. v. Titan Wheel Intern., Inc.,* 212 F.3d 1377 (Fed.Cir.2000)). Thus, Claim 29 outlines the three necessary steps in the patented process.

### (a) Encoding a First Identification Number Onto Said Data–Encoded Strip

The first step describes the process for encoding an identification number on the card's magnetic strip. The word encoding is used to indicate that certain information (i.e., the identification number) has been converted into a code. *See Webster's* at 409 (defining the term as "convert[ing] from one system of communications into another; esp: to convert (a message) into code"). This encoded information is placed on "a well-known magnetic strip, a strip of well-known bar codes, a strip of well-known machine-readable optical characters, or any other well known manner of encoding data into machine-readable form . . . ." U.S. Patent, Column 5:15–21.

*(b) Associating a First Representation of Said First Identification Number with Said Metered Account Within a Processing Apparatus (i) Then Using a Data-encoded Strip Reader to Read Said Encoded First Identification Number from Said Exposed Data-encoded Strip while Said First Card Is Secured to Said First Panel; (ii) Then Transmitting a First Characterization of Said First Identification Number from Said Data–Encoded Strip Reader to Said Processing Apparatus; (iii) Then Using Said First Characterization of Said First Identification Number to Identify Said Metered Account by Said Processing Apparatus; (iv) Then Activating Said Metered Account by Said Processing Apparatus.*

■ Once the magnetic strip has been encoded with the identification number, the activation process begins. Paragraph (b) of Claim 29 describes in detail the activation process. As is clear from the text, subparagraph (b) has four sub-parts, each beginning with the word "then" to indicate that a sequence limitation exists on the order that these steps must be executed. Pl.'s Brief at 29. The method recited in these steps is graphically depicted in Figure 18 of the Patent (e.g., parts (i), (ii), (iii) and (iv)).

The first step refers to the actual process of "associating . . . an identification number with . . . [a] metered account within a processing apparatus." Associating means to join or connect together, while representation signifies to represent or stand for. *Webster's* at 110. Combined, this language suggests that the patented method involves the process of connecting something that represents the first identification number with a metered account stored in a processing apparatus. No par-

ticular program or structure is provided for the processing apparatus. Any apparatus can perform the desired association.

The specifications support this interpretation. The text of the patent describes this step as follows.

> A representation of the control number, the PIN number, and the associated metered account are entered into a remote data processing apparatus, such as a digital computer with attached data storage memory, in a manner well-known to those skilled in the art. Any well known computer programing technique, such as preferably a correspondence table, can be used to associate the control number and PIN with a metered account . . . .

U.S. Patent, Column 19:22–30.

Once a relationship has been established between a specific identification number and a particular account, the account can be activated by following the three claimed sub-steps (i.e., sub-steps b(i), b(ii), b(iii) and b(iv)). First, the data-encoded strip on the card must be read while the card is still attached to the package. The plain language suggests that a data-encoded strip reader of any kind can be used to read the magnetic strip. The only requirement is the card remains attached to the package during the activation process. The specification confirms this limitation. As they describe the process, "[w]hen the first card is secured to the first panel, the data-encoded strip can be read directly from the first card without removing the card from the package . . . ." U.S. Patent, Column 2:42–46.

The magnetic strip then transmits the identification number from the strip to a processing apparatus. *See* U.S. Patent, Column 25:5–7 ("then transmitting a first characterization of said first identification number from said data-encoded strip reader to said processing apparatus;"). The key term transmitting is used to convey its

ordinary meaning of sending. *Webster's* at 1254. The magnetic strip sends the encoded information to a processing apparatus.[17] The processing apparatus, in turn, uses the data representing the identification number to identify the correct metered account. *See id.* at Column 25:7–10 ("(iii) then using said first characterization of said first identification number to identify said metered account by said processing apparatus;"). Only then does the processing apparatus activate the account. *See id.* at Column 25:10–12 ("(iv) then activating said metered account by said processing apparatus;"). The specifications describe this process in more detail.

> The receiving modem is connected to the digital computer and forwards the characterization of the control number to the digital computer. The digital computer uses this characterization of the control number to identify the associated metered account ... and then activates that particular associated metered account.

U.S. Patent, Column 19:61–20:1.

### (c) Crediting Said Metered Account With a Certain Predetermined Balance

The language of subparagraph (c) makes clear that the metered account that is activated has a fixed balance at the time it is credited. *See* U.S. Patent, Column 25:14–

15 (describing the amount as a predetermined balance). In other words, the balance has been fixed prior to the time the card is activated. *Webster's* at 346; 222–23 (defining the term predetermined as determined before hand and determined as fixing). The activation process creates a balance in the customer's favor for the particular account that has been entered. *Webster's* at 305. Because there is "no time sequence limitation ... in the order of execution of subparagraphs (a), (b) and (c) of Claim 29 relative to each other," the predetermined balance can be assigned at any time. A balance can be assigned when the card is manufactured or at the point of purchase, where the consumer chooses an amount.[18] Pl.'s Brief at 29.

### 2. Summary of Claim 29

▮ In sum, the Court construes the language of Claim 29 to encompass a method: (1) for associating an identification number with an account, (2) encoding the identification number on a magnetic strip, (3) activating the account by swiping the magnetic strip through a reader while the card remains attached to the package, (4) using a processing apparatus to recognize the existing relationship between the identification number and the account, and (5) crediting said account with a fixed predetermined balance.

17. The digital computer can then be linked to data-encoded strip readers located at many different retail stores so that, when a data-encoded strip is read as the card and package combination is purchased, a characterization of the control number can be transmitted to the digital computer. Preferably, modems will be used to transmit the characterization of the control number over telephone lines, but any method of data transmission could be used ....
U.S. Patent, Column 19:30–49, 57–64.

18. The specifications make clear that no time limitations are involved. The relevant portion states:

> The digital computer uses this characterization of the control number to identify the associated metered account in a manner now understood by those skilled in the art, and then activates that particular associated metered account. The metered account may have been credited with a certain predetermined balance when the metered account was entered into the digital computer, but, if not[,] the digital computer will now credit the metered account with a certain predetermined balance.
U.S. Patent, Columns 19:64–20:5.

## D. Claim 30

### 1. The Method of Claim 29 Which Further Comprises the Steps Of:

Once the account has been activated, Claim 30 describes how a customer can access the credited account. Pl.'s Brief at 32. As described in the specifications, the preferred method for using the cards is via a PIN number. Once the metered account has been activated at the point of purchase, "[t]he customer can [ ] remove the first card [ ] from the package and store the card [ ] in any convenient place...." U.S. Patent, Column 20:6–17. The cardholder can then obtain goods or services by entering a PIN number which debits the appropriate metered account.[19]

Similar to Claim 29, the language of this section indicates that Claim 30 also involves multiple steps. As with Claim 29, the steps here are also joined by the word "then," placing a temporal limitation on the order of the outlined steps. Steps (a), (b) and (c) must follow the sequence in which they are presented.

### (a) Associating a Second Representation of a Second Identification Number with Said Metered Account within Said Processing Apparatus; then

This first step provides the framework that will cause the PIN to correspond to a specific metered account.[20] Pl.'s Brief at p. 32. As with Claim 29, the term associating takes on its ordinary meaning. In this case, this subparagraph describes the process of connecting or joining together an identification number with the metered account. Although the text of the Claim does not explicitly indicate that the second representation refers to a PIN number, the specifications make clear that this is the appropriate construction. See U.S. Patent, Column 18:58–61 ("The first card [ ] also has a unique second identification number thereon, and this second identification number is the PIN [ ] that allows access to the funds in a metered account."). Thus, this subparagraph claims a method for establishing a connection between a PIN number and a metered account within a processing apparatus. Similar to Claim 29, this processing apparatus can take different structures or shapes. See U.S. Patent, Column 20:6–17 (describing a number of acceptable embodiments for the apparatus).

### (b) Using a Second Characterization of Said Second Identification Number to Identify Said Metered Account By Said Processing Apparatus; and then

Once the correspondence between the PIN number and the metered account has been established, the customer can then use the PIN number to identify the metered account whenever he/she wants to obtain services or goods. In other words, "the digital computer [ ] uses the characterization of the PIN to identify the associated metered account." U.S. Patent, Column 20:18–20.

---

19. The customer preferably then enters the PIN [ ] onto the telephone keypad, but the PIN [ ] could instead be entered into a personal computer, which is connected to the digital computer [ ] by modems or the PIN [ ] could be entered using another well-known data entry device ... A characterization of the PIN is then transmitted to the digital computer ...

U.S. Patent, Column 20:6–17.

20. Plaintiff correctly notes that this setup step "need only happen once," but "could occur many times because no limitation is placed on the number of times this step is performed." Pl.'s Brief at 32–33.

*(c) Providing Access to Services and Debiting Said Balance of Said Metered Account for Said Providing of Said Services.*

Successful identification of the metered account through the PIN number will provide access to the services and debit the appropriate amount from the balance on the account. As the specifications explain, "the digital computer [ ] provides the customer with access to goods or services, for example, telephone services, and the digital computer [ ] then debits the balance from the metered account." U.S. Patent, Column 20:20–23.

### 2. Summary of Claim 30

 Thus, the Court construes Claim 30 to include a method for (1) associating a PIN number to a specific account, (2) using the PIN number to identify the metered account and (3) providing access to goods or services purchased.

## IV. Conclusion

In conclusion, this Court construes the relevant Claims of the '909 patent as follows:

### Claim 12

The Court finds that Claim 12, which describes the card-package combination, requires that (1) the magnetic strip on the card be exposed to view (2) in such a manner that the strip lies parallel to one of the edges of the package, and (3) that the card be secured to the package using means that reveal any evidence of tampering to a potential customer.

### Claim 29

The Court construes the language of Claim 29 to establish a method for (1) for associating an identification number with an account, (2) encoding the identification number on a magnetic strip, (3) activating the account by swiping the magnetic strip through a reader while the card remains attached to the package, (4) using a processing apparatus to recognize the existing relationship between the identification number and the account, and (5) crediting the account with a fixed predetermined balance.

### Claim 30

Finally, the Court construes Claim 30 as providing a method for (1) associating a PIN number to a specific account, (2) using the PIN number to identify the metered account and (3) using the PIN number to gain access to goods or services.